## THE KATHLEEN TRACY.

## THE LAKE LEDAN.

(District Court, S. D. New York. January 24, 1923.)

1. **Collision** ⟫71(3)—**Steamer did not become outlaw merely because she dragged off anchorage ground.**

   A steamer did not become an outlaw, so as to make her at fault in case of collision, merely because she dragged off anchorage ground.

2. **Collision** ⟫71(3)—**Steamer not obstruction to navigation merely because she anchored outside of anchorage grounds.**

   A steamer did not become an obstruction to navigation, so as to be at fault in case of collision, merely because she anchored outside of anchorage grounds, though she could have been compelled to move on to anchorage grounds by the federal authorities, if they had thought it advisable.

3. **Collision** ⟫74—**Collision between steamer anchored outside of anchorage grounds, and tug, meeting another starboard to starboard, held fault of master of tug.**

   Evidence *held* to prove collision between steamer, anchored outside of anchorage grounds, and tug, with hawser tow of five light coal boats, which resulted when one of the tiers of the tug's tow fouled one of the steamer's anchor chains, after the tug had met another tug starboard to starboard, was the fault of the master of the tug, there having been ample time and space to comply with Inland Regulations, art. 25 (Comp. St. § 7899).

In Admiralty. Libel by Edith Y. Price against the tug Kathleen Tracy, in which the United States, owner of the steamer Lake Ledan was impleaded. Libel against the United States dismissed, and interlocutory decree entered against the tug Kathleen Tracy.

Decree affirmed 296 Fed. 713.

Leo J. Curren, of New York City, for libelant.

Foley & Martin and James A. Martin, all of New York City, for the Kathleen Tracy.

William Hayward, U. S. Atty., and H. T. Atkins, both of New York City, for the United States.

WARD, Circuit Judge. Shortly after midnight of November 19, 1919, the tug Kathleen Tracy, with a hawser tow of five light coal boats, three in the first tier and two in the second, passed out of the East River, bound to Arlington, Staten Island. The wind was blowing a strong breeze from the northwest, the tide was ebb, and the night dark and clear.

[1, 2] About 5 p. m. of the same day the steamer Lake Ledan, which had been lying anchored for two days on the general anchorage ground at Bedloe's Island on her port anchor, with 45 fathoms of chain down, began to drag in a fresh gale, which rose for a period of five minutes to a maximum of a strong gale. The officer in charge of the steamer very properly let her continue to drag across the main channel, and did not drop her starboard anchor, with 45 fathoms of chain, until she reached a point south of Governor's Island; then veering out 35 fathoms more on the port anchor brought the steamer up at a point between

the main channel and Buttermilk Channel, some 1,200 feet south of Governor's Island. Though this point was not on the Red Hook anchorage ground, which is the nearest anchorage ground, I can think of no better place to lay up the steamer under the circumstances, so far as navigation is concerned. It is true that no other vessel dragged off the anchorage ground, and that with her other anchor down, or perhaps even with a longer scope of chain on the port anchor, the steamer might not have dragged at all. But she does not become an outlaw because she dragged off the anchorage ground; nor does she become an obstruction to navigation ipso facto because she anchored again outside of anchorage grounds. She could have been compelled to move on to anchorage grounds by the federal authorities, if they thought it advisable, and would be liable for damages caused by her being an obstruction to navigation. The Municipal (D. C.) 108 Fed. 895; The Pocahontas, 235 Fed. 116, 148 C. C. A. 610; The John G. McCullough, 239 Fed. 111, 152 C. C. A. 153.

[3] The master of the Tracy saw the head light and green light of a tug with a car float on each side, bound up. This tug blew a signal of two whistles, which he answered with two, and they passed starboard to starboard. The second tier of the Tracy's tow then fouled one of the Lake Ledan's anchor chains, which caused the first tier to swing apart across the steamer's bow; the libelant's boat, which was the starboard hawser boat, lying on the steamer's starboard side, and the rest of the tow off her port bow.

It is clear to me that the Lake Ledan anchored at or very near the spot where she was found the next morning, and where she remained for a day or two, a little south of Governor's Island, and not in the main channel lower down, as the master of the Tracy testified. This is a fixed and pivotal fact in the case.

As the Tracy's tow fouled the steamer's anchor chain very shortly after passing the carfloat tow, it is evident that the collision occurred at the south end of Governor's Island or below it, and that the lights of the tug and car float must have been visible to those on board the Tracy when she was nearly a mile further up the bay, coming out of the East River into the main channel. There was then plenty of time and space for her to go down, as article 25 of the Inland Regulations of June 7, 1897 (Comp. St. § 7899), requires, on the side of the channel on her starboard hand. She got pocketed when the car float tow was only 700 or 800 feet off, which proves that the lookout did not see the tug's head light and green light until it was too late to cross the bow of the car float tow. Furthermore, the master of the Tracy admits that he did not see the Lake Ledan's anchor lights some 800 or 900 feet further down until he had hard-aported to clear her after the car float tow had passed, which shows additional negligence. I do not think that the Lake Ledan was an obstruction to navigation.

The libel against the United States, as owner of the steamer Lake Ledan, is dismissed, and the usual interlocutory decree may be entered against the steam tug Kathleen Tracy.